**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MIGUEL J. RODRIGUEZ, | ) | |
| | ) | CASE NO.   3:11-cv-398 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant. | ) | |

This case is before the magistrate judge by consent.  Plaintiff, Miguel J.

Rodriguez ("Rodriguez"), challenges the final decision of the Commissioner of Social

Security, Michael J. Astrue ("Commissioner"), denying Rodriguez's application for a

period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the

Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).   This court has jurisdiction

pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court REVERSES the opinion of the

Commissioner and REMANDS the case for further proceedings.

I.  Procedural History

Rodriguez filed applications for DIB and SSI on March 30, 2006, alleging

disability as of August 22, 2004.  His applications were denied initially and upon

reconsideration.  Rodriguez timely requested an administrative hearing.

Administrative Law Judge Kelly Davis ("ALJ") held a hearing on April 9, 2009. Rodriguez, represented by counsel, testified on his own behalf at the hearing.  Joseph Havranek testified as a vocational expert ("VE").  The ALJ issued a decision on May 14, 2009, in which he determined that Rodriguez is not disabled.  Rodriguez requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on December 23, 2010, the ALJ's decision became the final decision of the Commissioner.

Rodriguez filed an appeal to this court on February 24, 2011.  Rodriguez alleges that the ALJ erred because substantial evidence does not support the ALJ's evaluation of the opinions of (1) Rodriguez's treating cardiologist regarding Rodriguez's functional limitations; (2) the non-examining state agency psychologist; and (3) the examining state agency psychologist.  The Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    *Personal and Vocational Evidence*

Rodriguez was born on July 6, 1958 and was 50 years old on the date of the hearing.  He has completed tenth grade.  His past relevant work includes truck driver, dishwasher, short order cook, factory laborer, shipping and receiving clerk, cleaning supervisor, and mail clerk.

### B.    *Medical Evidence*

On August 22, 2004, Rodriguez reported to the emergency center of St. Charles Mercy Hospital in Oregon, Ohio ("St. Charles"), complaining of chest pain radiating around the left side to his back.  Transcript ("Tr."), pp. 375-78.  According to Rodriguez, he had been suffering from chest pain on and off for about a month.  Rodriguez said

2

that he had been using marijuana and cocaine the night before, that he had a history of cocaine and heroin abuse, and that he was a pack a day smoker.  Rodriguez had previously undergone a left lung lobectomy due to abscesses on his lungs.  A chest x-ray, an EKG, and other tests were normal, but blood sugar was high.  Rodriguez was eventually diagnosed as having suffered an acute myocardial infarction and was suffering from cocaine abuse.  Rodriguez was given Dilaudid, Phenergan, Rocephin, Biaxin, Darvocet, and Ultram.  The following day, he underwent cardiac catheterization and placement of a stent.

On August 6, 2004, T. Welch, M.D., a cardiologist, examined Rodriguez and completed a physical functional capacity assessment of his capabilities.  Tr. at 379.  Dr. Welch opined that Rodriguez was not limited in his ability to stand, walk, or sit; could lift or carry 11-20 pounds occasionally or frequently; was moderately limited in his abilities to push/pull, bend, reach, and handle; and was not significantly limited in his abilities to engage in repetitive foot movements, see, hear, or speak.  Dr. Welch further opined that Rodriguez was unemployable and that his limitations would last for 12 months or more.

On November 10, 2004, Rodriguez underwent an MRI of his lumbar spine.  Tr. at 205-08.  Rodriguez stated that he had been experiencing pains in his lower back radiating into his buttocks, describing the pain as about 6 on a scale of 10 when resting and 10 out of 10 when active.  He stated that he had suffered a number of falls, but he was unable to pinpoint any particular fall as the source of his back problems.  According to Rodriguez, the pain was worsened by sitting, lying on his stomach, weather changes, standing, walking, sleeping, and driving.  There were no bladder problems or problems with numbness, tingling, or weakness in his lower extremities.  His then-current

3

medications included Plavix, Zocor, Amaryl, Aspirin, nitroglycerin, and Metoprolol.  The MRI revealed disc deterioration with mild degenerative narrowing, a shallow disc bulge at L3-L4, mildly thickened ligaments, and facets at L3-L4, L4-L5, and L5-S1.

On December 28, 2004, one of Rodriguez's treating physicians, Michael J. Barrett, M.D., noted that Rodriguez suffered from radiating back pain and experienced pain upon straight leg raises and back extension.  Tr. at 209.  He also noted non-insulin dependent diabetes and hypertension.  He recommended a series of epidural steroid injections for Rodriguez's back pain.  On January 1 and February 8, 2005, Rodriguez received epidural blocks to help relieve his back pain.  Tr. at 209-13.

Rodriguez suffered a second heart attack on March 31, 2005.  Tr. at 215-24.  He was treated at the St. Vincent Mercy Medical Center emergency room and was admitted to the medical facility for treatment.  The following day, Rodriguez was catheterized.  He was diagnosed with coronary heart disease characterized by 40% proximal stenosis of the circumflex coronary, with a stent mid segment and 30% stenosis of the right coronary artery.

Rodriguez was admitted to St. Charles on April 18, 2005 with chest pain.  Tr. at 226.  He was treated with nitroglycerin and morphine and released on April 22, 2005.  He was admitted to St. Charles again on May 4, 2005 suffering from abdominal pain.  Tr. at 225.  He was diagnosed as suffering from acute pancreatitus, treated, and released the following day.

Rodriguez reported again to St. Charles complaining of chest pains radiating into his left arm on  February 6, 2006.  Tr. at 228-57.  He stated that his cocaine abuse had relapsed and that he had been injecting, snorting, and smoking $300-$400 worth of

4

cocaine a day for the past two months, drinking at least a case of beer a day, and taking Percocet, Vicodin, and Darvocet.  He was depressed and tearful, stating that he wanted to commit suicide by taking his girlfriend's medications because "I just can't take what I'm doing to myself anymore."  Tr. at 228.  He told the treating physician that he had been smoking 2-3 packs of cigarettes a day for the past 34 years.  Rodriguez said that had lost 20 pounds in the past two months.  He was producing black phlegm and had bright red blood in his stool.  He also complained of chronic fatigue and sleeplessness.  The treating physician recommended admission for rehabilitation.

While Rodriguez was in St. Charles, he underwent a series of physical and mental tests.  Tr. at 234-57.  Rodriguez reported a family history of heart disease, diabetes, drug abuse, and alcohol abuse.  He had begun using drugs at age 12 or 13 and had been using a variety of drugs off and on since, with three years being his longest period of sobriety.  Marsha L. Elliott, L.S.W., diagnosed Rodriguez as suffering from an unspecified  depressive disorder, an unspecified anxiety disorder, cocaine dependence, cannabis dependence, and alcohol dependence, and assigned him a current Global Assessment of Functioning ("GAF") of 50.[1]

On April 18, 2006, Arun Patel, M.D., Rodriguez's treating psychiatrist, completed an initial psychiatric evaluation of Rodriguez.  Tr. at 262-63.  Rodriguez reported chronic depression, chronic use of multiple drugs, and chronic alcohol use.  Rodriguez was currently taking Zoloft, metformin, Seroquel, Plavix, Zocor, Lopressor, and Amaryl.  He stated that he had never had any psychiatric counseling or other mental therapy

---

[1]  A GAF of 41 to 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.

except some treatment for drug addiction.  Rodriguez reported that he had not used

drugs since leaving the hospital.  Dr. Patel assessed his concentration as adequate,

judgment as fair, and insight as good.  Dr. Patel diagnosed Rodriguez as suffering from

dysthymia, major depression in partial remission, polysubstance dependence, diabetes,

mellitus, hypertension, and coronary heart disease.  He assessed Rodriguez's GAF as

from 50-65.  Dr. Patel noted that Rodriguez intended to attend supportive

psychotherapy and medication management.

James C. Tanley, Ph.D., a clinical psychologist, conducted a clinical interview

with Rodriguez on September 12, 2006 and completed a Disability Assessment Report

describing his evaluation.  Tr. at 301-03.  Rodriguez reported currently taking Zoloft,

Seroquel, Amaryl, Atrivan, Zocor, Plavix, Metformin, Prevacid, nitroglycerin, and

Docusate.  He said that he had not used drugs or alcohol for eight months and that he

"did it myself."  Tr. at 301.  He also reported that he had stopped smoking.  Dr. Tanley

reported Rodriguez as being obese, clean, and cooperative.  Dr. Tanley opined that

Rodriguez did not seem to exaggerate or minimize his symptoms.  Rodriguez's thoughts

were coherent, relevant, and goal-oriented.  Affect was appropriate to thought content.

Recent and remote memory were poor, and intellectual functioning was no higher than

borderline.  Otherwise, there were no abnormalities of thought or affect.  Rodriguez

reported panic attacks and anger since he had stopped using drugs and alcohol, stating

that "since I've been clean, my emotions are uneven.  All of a sudden, I'll feel closed in.

It's hard to breathe 'n [sic] be around people."  Tr. at 304.  He reported sleep

disturbance, feelings of helplessness, and mood problems.  Dr. Tanley opined that

Rodriguez was unimpaired in his ability to relate to others, mildly impaired in his ability

6

to understand and follow simple instructions, mildly impaired in his ability to maintain attention to perform simple repetitive tasks, and moderately impaired in his ability to withstand the stress and pressure of daily work.  He diagnosed Rodriguez as suffering from a chronic adjustment disorder with mixed anxiety and depression, drug abuse in remission, borderline intelligence, obesity, diabetes, high blood pressure, diverticulitis, high cholesterol, acid reflex, constipation due to medication, and status post heart attack.  He assigned Rodriguez a GAF of 60.[2]

In late September 2006, William D. Padamadan, M.D., examined Rodriguez, reviewed laboratory tests, and completed an Internal Medicine Evaluation.  Tr. at 305-08.  Dr. Padamadan noted that Rodriguez was currently undergoing psychiatric and psychological management for drug abuse through the local community psychiatric center.  The doctor recited Rodriguez's medical history and added that his diabetes was currently being managed by Metformin and Amaryl.  Rodriguez said that he had suffered from back pain for many years, but he denied paresthesias, foot drops, falls, or bladder incontinence.  Gait was normal, and there was no outward manifestation of chronic illness.  Vision was 20/30 right and 20/70 left, and blood pressure was 154/86.  Examination of the neck, chest, lungs, heart, abdomen, and extremities produced normal results.  Supine single leg raising was to 40○ and sitting single leg raising was to 80○.  Otherwise, examination of the spine and back was unremarkable.  Speech, ambulation, sensorium, motor abilities, muscle tone, and reflexes were normal.  Dr. Padamadan concluded:

---

[2] A GAF of 51-60 indicates moderate symptoms or moderate impairment in social, occupational, or school functioning.

7

His hearing, speech, and sight were within normal limits.  Communication skills were normal.  He was able to sit, stand, and walk.  His upper extremity functions for reaching, handling, fine, and gross movements were intact.  His mental status was normal without any overt signs of anxiety or depression.  Based upon this clinical evaluation, he would need psychological restrictions for a 48-year old diabetic with coronary artery disease.  He has no contraindication for stress testing.

Tr. at 308.

On October 25, 2006, Charles Derrow, M.D., reviewed Rodriguez's file and completed a Physical Residual Functional Capacity Assessment of Rodriguez.  Tr. at 332-39.  Dr. Derrow opined that Rodriguez could lift up to 50 pounds occasionally, 25 pounds frequently, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull without limitation.  In explaining why he reached these conclusions, Dr, Derrow wrote:

clmt alleges diabetes, back pain, heart disease, breathing problems, depatitis C, and diverticulitis.  His diabetes is stable with medication.  An Ls MRI in 2004 showed mild DDD and a shallow disc bulge L3-4.  At the CE, he had a normal gait, no ambulatory aid, normal strength, and full ROM.  He did have a heart attack and stenting in 2004, possibly related to cocaine use.  Repeat cath 2005 showed no changes.  He seems to get chest pain when he uses cocaine as he last complained of it 8 months ago with drug use.  He had a lobectomy a few years ago due to a lesion from inhaling cocaine.  He does have hepatitis C with no complications.  His f/p was waiting for abstinence from drugs before he referred him for tx.  He has mild diverticulitis . . . He does not complain of problems with this currently.

Tr. at 334 (capitalization and abbreviations in the original).  Dr. Derrow further opined that Rodriguez could frequently climb ramps and stairs, balance, stoop, kneel, and crouch and could occasionally climb ladders/ropes/ scaffolds and crawl.  He did not find that Rodriguez had any manipulative, visual, communicative, or environmental limitations.  Dr. Derrow concluded that Rodriguez's symptoms were attributable to a determinable medical impairment, that the severity or duration fo the symptoms were

8

not disproportionate to the impairment, and that most of Rodriguez's problems were related to drug use.  With abstinence, according to Dr. Derrow, Rodriguez was stable. He found Rodriguez's allegations of disability to be partially credible.  Dr. Derrow noted that no treating or examining source statements regarding Rodriguez's physical capabilities was in the file.  On February 8, 2007, Lynne Torello, M.D., reviewed and affirmed Dr. Derrow's assessment.

On October 23, 2006, Karen Stailey-Steiger, Ph.D., reviewed Rodriguez's file and completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique.  Tr. at 314-31.  Dr. Stailey-Steiger opined that Rodriguez was moderately limited in his ability to remember locations and work-like procedures; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  She also opined that he was markedly limited in his ability to understand and remember detailed instructions and his ability to carry out detailed instructions.  She did not find any other significant psychological limitations.  She summarized her assessment as follows:

> clmt alleges depression.  Has a history of polysubstance abuse currently in remission for 8 months.  He is receiving medication and counseling which has improved his conditions.  He is attending meetings to help with his sobriety.  He alleges panic attacks and anxiety.  Claimant attended a psych CE,  His intelligence is estimated to be borderline.  Daignoses [sic] included BIF and Adjustment DO.  GAF was estimated at 60.  He is able to perform ADL's.  He has no social limitations.  He is best suited for 1-2 step tasks with no pace or production requirements.  Allegation of depression is reported by CE findings. Limitations are mild to moderate in severity.

9

Tr. at 316 (capitalization and abbreviations in the original).  Dr. Stailey-Steiger

diagnosed Rodriguez as suffering from dysthemia, major depression in remission,

borderline intellectual functioning, and polysubstance abuse in partial remission.  She

opined that Rodriguez had mild restriction of activities of daily living; mild difficulties in

maintaining social functioning; moderate difficulties in maintaining concentration,

persistence, or pace; and one or two episodes of decompensation of extended duration.

On February 6, 2007, Vicki Casterline, Ph.D., reviewed and affirmed Dr. Stailey-

Steiger's assessment.  Tr. at 351.

On November 13, 2008, Alamdar Kazmi, M.D., a psychiatrist, completed a

Mental Functional Capacity Assessment of Rodriguez.  Tr. at 380-81.  Dr. Kazmi opined

that Rodriguez was moderately limited in the ability to understand and remember

detailed instructions; the ability to carry out detailed instructions; the ability to maintain

attention and concentration for extended periods ; the ability to perform activities within

a schedule, maintain regular attendance, and be punctual within customary tolerances;

the ability to work in coordination with or proximity to others without being distracted by

them; the ability to complete a normal workday and workweek without interruptions from

psychologically-based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; the ability to accept instructions and

respond appropriately to criticism from superiors; the ability to get along with coworkers

or peers without distracting them or exhibiting behavioral extremes; the ability to

respond appropriately to changes in the work setting; the ability to travel to unfamiliar

places or use public transportation; and the ability to set realistic goals or make plans

independently of others.  Dr. Kazmi found no other significant limitations.

10

John A. Pella, M.D., a medical expert, reviewed Rodriguez's file and completed a Testimony by Affirmation of Medical Expert on November 22, 2008.  Tr. 371-73.  Dr. Pella opined that Rodriguez did not meet or medically equal an impairment listed in  20 CFR Part 404, Subpart P, Appendix 1.  Dr. Pella found that Rodriguez could frequently lift 10 pounds, occasionally lift 20 pounds, could stand or walk about six hours in an eight-hour workday, could sit for six hours in an eight-hour workday, and was not limited in his ability to push, pull, bend, stoop, or crouch.  He also found that Rodriguez had slight limitations in his ability to understand and remember simple instructions, carry out simple instructions, interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to changes in routine and work setting.  Dr. Pella further opined that Rodriguez had moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, make judgments on simple work-related decisions, and respond appropriately to pressures in the usual work setting.

On January 28, 2009, Mehmet Sungurlu, M.D., Rodriguez's treating physician, completed a medical report of Rodriguez's condition.  Tr. at 382-83.  According to Dr. Sungerlu, who reported Rodriguez suffered from depression, chronic back pain, hyperlipidemia, and addictive disorders, and his condition was good to stable with his medications.  Dr. Sungurlu also reported that Rodriguez had just had another stent installed in the past two weeks and would benefit from a smoking cessation program.  Dr. Sungurlu opined that Rodriguez's conditions limited his abilities to lift and carry, limiting him to about five pounds.  Rodriguez's abilities to stand or walk, sit, push or pull, bend, reach, handle, engage in repetitive foot movements, see, hear, or speak were not

11

significantly limited or were not limited at all.  Dr. Sungurlu added that Rodriguez was
employable with restrictions.

*C.*     *Hearing testimony*

The ALJ held a hearing on April 9, 2009 at which Rodriguez and a VE testified.
Tr. at 23-54.  Rodriguez testified that he was disabled because of chronic back pain,
which limited his ability to sit, stand, and walk.  Tr. at 27-28.  According to Rodriguez, he
was able to stand for about a half hour, walk comfortably for about two blocks, and sit
for only a few minutes before experiencing pain.  Tr. at 28-29.  Rodriguez also testified
that he ran out of breath with any kind of exertion because of his heart condition.  Tr. at
28.  He also said that his heart condition caused him chest pains as well as shortness of
breath and required the use of nitroglycerin and Seroquel.  Tr. at 29-30.  His most
recent heart attack had occurred the previous January after spending five minutes
shoveling snow around his car.  Tr. at 31.  Rodriguez reported attending Unison to help
him stay sober.  Tr. at 31.  When asked whether his medications caused any side
effects, Rodriguez testified that they caused diarrhea, runny nose, dizziness,
drowsiness, and impaired short-term memory.  Tr. at 31-32.  Rodriguez also said that
he experienced frequent panic attacks.  Tr. at 32-33.  He reported taking insulin twice
daily for his diabetes and having occasional hypoglycemic episodes, body aches, and
loss of feeling in his extremities.  Tr. at 33-35.  Rodriguez also told the court that he
suffered from cataracts.  Tr. at 42.

Rodriguez described his typical day as spent largely in his apartment because he
tries to avoid crowds.  Tr. at 37-38.  He is able to do housework as long as he does it
slowly.  Tr. at 38.  He rarely socializes, although he attends church and is sometimes

visited by church members. Tr. at 38. Rodriguez also reported that he had good days and bad days and that he experienced bad days two or three times a week. Tr. at 43-45.

The ALJ posed several hypothetical questions to the VE. First, he asked the VE to assume an individual capable of light work and limited to lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently; limited to standing/walking six hours in an eight-hour day and sitting for six hours in an eight-hour day; having an unlimited ability to push or pull; able to frequently climb ramps and stairs, balance, stoop, kneel, crouch; and able to occasionally climb ladders, ropes, or scaffolds, and crawl. In addition, the VE was asked to assume that the individual could perform simple, routine tasks involving simple, short instructions and simple work-related decisions with few workplace changes and no pace or production requirements. The VE opined that such an individual could not perform Rodriguez's past work but could perform a range of unskilled work, including laundry folder, microfilm processor, and collator operator.

The ALJ then asked the VE to assume an individual as previously described by limited to less than sedentary work because unable to lift more than five pounds. The VE testified that such an individual could perform such work as hand mounter of photographic products, table worker, or microfilm document preparer.

Finally, the ALJ asked the VE if there would be work for the described individual if that individual would be absent four days a month. The VE said that there would not be any work for such an individual.

Rodriguez's attorney asked the VE to assume an individual with moderate

limitations in his ability to work within a regular schedule, maintain regular attendance

be punctual within customary tolerances, complete a normal work day or work week

without interruptions from psychological symptoms, and moderate limitations in his

ability to perform at a consistent pace without an unreasonable number and length of

rest periods.  When asked whether there were jobs for such an individual, the VE

testified that there were not.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes

disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health &*

*Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when

he cannot perform "substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months."

20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain

income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled

by way of a five-stage process.  First, the claimant must demonstrate that he is not

currently engaged in "substantial gainful activity" at the time he seeks disability benefits.

Second,  the claimant must show that he suffers from a "severe impairment" in order to

warrant a finding of disability.  A "severe impairment" is one which "significantly limits . .

. physical or mental ability to do basic work activities."  Third, if the claimant is not

performing substantial gainful activity, has a severe impairment that is expected to last

for at least twelve months, and the impairment meets a listed impairment, the claimant

14

is presumed to be disabled regardless of age, education or work experience. 20 C.F.R.

§§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not

prevent his from doing his past relevant work, the claimant is not disabled. For the fifth

and final step, even if the claimant's impairment does prevent his from doing his past

relevant work, if other work exists in the national economy that the claimant can

perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.

1990).

IV. Summary of Commissioner's Decision

In determining that Rodriguez was not disabled, the ALJ made the following

relevant findings:

3.   The claimant has the following severe impairments: low back pain; diabetes mellitus; coronary artery disease; bipolar disorder; borderline intellectual functioning; and history of polysubstance dependence.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). With normal breaks, he can stand and walk for about 6 hours in an 8 hour workday. He is also able to frequently climb ramps and stairs, balance, stoop, kneel, and crouch and has the occasional ability to climb ropes, scaffolds, ladders, and crawl. From a mental health perspective, the claimant is able to perform simple, routine tasks involving no more than simple, short instructions and simple, work-related decisions with few workplace changes. However, he is unable to work in occupations that require pace or production requirements.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born on July 6, 1958, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced

age.

8.      The claimant has a limited education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 22, 2004 through the date of this decision.

Tr. at 14-22.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

16

Rodriguez alleges that the ALJ erred because substantial evidence does not support the ALJ's evaluation of the opinions of (1) Rodriguez's treating cardiologist regarding Rodriguez's functional limitations; (2) the non-examining state agency psychologist; and (3) the examining state agency psychologist.  The Commissioner denies that the ALJ erred.

A.      *Whether substantial evidence supports the ALJ's evaluation of the opinions of Rodriguez's treating cardiologist regarding Rodriguez's functional limitations*

Rodriguez argues that the ALJ erred in his characterization of the opinion of Rodriguez's treating physician, Dr. Welch, as consistent with the opinion of the non-examining agency doctor, Dr. Pella.  The Commissioner asserts that substantial evidence supports the ALJ's assessment of Dr. Welch's opinion because any limitations in Dr. Welch's opinion that were not included in Dr. Pella's opinion were not significant.

The opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).

17

Nevertheless, the ALJ must provide "good reasons" for the weight assigned to treating physicians.  Failure to do so does not constitute harmless error and requires remand. *Wilson v. Commissioner of Social Security*, 378, F.3d, 541, 544 (6th. Cir. 2004).

Dr. Welch, a treating cardiologist, opined that Rodriguez was moderately limited in his abilities to push/pull, bend, reach, and handle.  Dr. Pella, an agency physician who did not examine Rodriguez, found that Rodriguez was not limited in his ability to push, pull, or bend and did not make any finding regarding Rodriguez's ability to reach or handle.  In giving greater weight to Dr. Pella's opinion than to the opinions of other treating and examining physicians, the ALJ stated, "I give greater wight to Dr. Pella's opinion as he had the opportunity to evaluate a majority of the medical evidence and his opinion is consistent with the claimant's treating source, T.G. Welch, M.D., who also indicated the claimant was capable of light work."  Tr. at 20.  The ALJ did not explain why he ignored Dr. Welch's opinions regarding Rodriguez's abilities to push/pull, bend, reach, and handle.  In the hypothetical question given to the VE, the ALJ asked the VE to assume an individual whose ability to push/pull was unlimited and did not ask the VE to assume any limitations with respect to bending, reaching, or handling.

The Commissioner responds that the failure to explain why the ALJ ignored portions of Dr. Welch's opinion and failure to include limitations in Rodriguez's abilities to push, pull, bend, reach, or handle was harmless because these limitations would not significantly limit one's ability to do light work.  The Commissioner argues:

> The Social Security Rulings at 83-14 and 85-15 indicate that light jobs require bending/stooping only occasionally (from very little to one-third of the time). Likewise, these Social Security Rulings explain that sedentary work requires good use of the hands and fingers for fine manual dexterity, but light jobs would not require fine use of the fingers for handling or fingering, thus accommodating

a moderate limitation on handling.  Social Security Ruling 85-15 states that significant limitations of reaching might eliminate large numbers of jobs at all exertion levels, but Dr. Welch did not place a significant limitation on reaching, only a moderate one.  Moreover, pushing and pulling weights up to twenty pounds, consistent with light work, could also be reasonably equated with a moderate restriction in this area.  As the doctor assessed only moderate restrictions in these four areas, not significant limitations, the ALJ reasonably concluded that Dr. Welch's opinion was consistent with light work, and accepted it as supporting Dr. Pella's conclusions as well as his decision.

Defendant's Brief on the MNerits, p. 14.

Plaintiff, quite rightly, takes issue with nearly every assertion in the Commissioner's argument.  First, the *ALJ* is required to give good reasons for the weight he assigned to the opinions of treating physicians, not attorneys arguing after the fact.  In the case of Dr. Welch's opinion with respect to limitations regarding pushing, pulling, bending, reaching, or handling, the ALJ failed to give any explanation whatsoever as to why he did not give that opinion controlling weight.  As the Sixth Circuit held in *Wilson*, that failure by itself requires remand.

Second, the Commissioner's attempt to equate "moderate" restrictions with "not significant" restrictions is inexplicable.  The form Dr. Welch used to indicate the degree to which Rodriguez was limited in various abilities provided five possible categories of limitation:  "none," "not significantly limited," "moderately limited," "markedly limited," and "extremely limited."  Dr. Welch checked "moderately limited" for pushing/pulling, bending, reaching, and handling.  To argue that "moderately limited" means "not significantly limited" is unsupportable.

Third, the Commissioner's argument confuses manipulation with handling.  As plaintiff notes, "handling" is a form of gross manipulation and consists of "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands."

19

Plaintiff's Brief on the Merits, p. 4 (quoting SSR 85-15).  "Fingering" is a form of fine manipulation and consists of "picking, pinching, or otherwise working primarily with the fingers."  Plaintiff's Brief at 4 (quoting SSR 85-15).  According to SSR 83-14:

> Unlike unskilled sedentary work, many unskilled light jobs do not entail fine use of the fingers. Rather, they require gross use of the hands to grasp, hold, and turn objects.  Any limitation of these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work.

(Unnumbered pages).  The Commissioner's argument that "light jobs would not require fine use of the fingers for handling or fingering, thus accommodating a moderate limitation on handling" confuses two distinct limitations, and it ignores the limitation that must be "considered very carefully" in the present case.

Plaintiff also argues that the ALJ's failure to include Dr. Welch's limitations in his hypothetical questions prejudiced Rodriguez.  Plaintiff cites the Dictionary of Occupational Titles ("DOT") as listing laundry folder, microfilm processor, and collator operator, the three jobs the VE testified Rodriguez could perform at the light exertional level, as requiring frequent reaching.  *See* Plaintiff's Brief at 10.  Frequent reaching is at odds with Dr. Welch's assessment that Rodriguez was moderately limited in his ability to reach.

Because the ALJ failed to explain why he failed to give Dr. Welch's opinion regarding Rodriguez's functional limitations controlling weight, the ALJ's decision is not supported by substantial evidence.  For this reason, the case must be remanded to the ALJ for a more careful examination of Dr. Welch's opinion and, if the ALJ decides not to give portions of that opinion controlling weight, a complete explanation of why the ALJ has reached that conclusion.

20

B.  *Whether substantial evidence supports the ALJ's evaluation of the opinions of the non-examining state agency psychologist*

Plaintiff contends that the ALJ stated that he gave substantial weight to Dr. Stailey-Steiger's opinion then failed to apply that opinion in giving a proper hypothetical question.  The ALJ found that Dr. Stailey-Steiger's opinion was "not inconsistent with the medical evidence as a whole, and [is] therefore accorded substantial weight in determining the claimant's residual functional capacity."  Tr. at 21.  Part of Stailey-Steiger's opinion, as the ALJ noted, was that Rodriguez was limited to performing "1 to 2 step tasks with no pace or production requirements."  Tr. at 20.  Plaintiff argues that the failure to include this limitation in any hypothetical question prejudiced Rodriguez:

> The DOT shows that the ALJ's error with respect to Dr. Stailey-Steiger's opinion at issue was harmful.  Each DOT occupation has a General Educational Development (GED), which has three elements: Reasoning, Math, and Language.  DOT, App. C.  Each DOT occupation has a Reasoning Level between 1 and 6. Id.  Appendix C of the DOT defines Reasoning Levels 1, 2, and 3:
>
> > 01 LEVEL REASONING DEVELOPMENT
> > Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
> >
> > 02 LEVEL REASONING DEVELOPMENT
> > Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.
> >
> > 03 LEVEL REASONING DEVELOPMENT
> > Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables.  Id. (emphasis added).[3]

In light of those definitions, only Reasoning Level 1 is consistent with Dr. Stailey-

---

[3]  Citing  http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Steiger's opinion about one-step and two-step tasks.  (R. at 316.)  All three DOT occupations underlying the ALJ's step-five decision have Reasoning Levels higher than 1:

| Occupation | DOT Reasoning Level |
|---|---|
| laundry folder 369.687-018 | 2 (Ex. A at 6) |
| microfilm processor 976.385-010 | 3 (Ex. A at 11) |
| collator operator 208.685-010 | 2 (Ex. A at 2) |

(R. at 22, 51.)  See also Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010) ("Only occupations with a reasoning development level of one necessarily involve only simple instructions"); Lucy v. Chater, 113 F.3d 905, 908-09 (8th Cir. 1997) (Reasoning Level 1 is consistent with the performance of "simple" duties and borderline intellectual functioning) . . . .

Plaintiff's Brief at 14-15.

Plaintiff overstates Dr. Stailey-Steiger's opinion with respect to one- and two-step instructions.  Dr. Stailey-Steiger did *not* opine that Rodriguez could only follow one- or two-step instructions.  Rather she opined, "He is *best suited* for 1-2 step tasks with no pace or production requirements."  Tr. at 316 (emphasis added).  Nevertheless, Dr. Stailey-Steiger's opinion clearly limits Rodriguez to 01 Reasoning Level Development.  That level permits carrying out "simple one- or two-step instructions."  The next level, 02 Level Reasoning Development, requires carrying out "detailed . . . written or oral instructions."  Dr. Stailey-Steiger opined that Rodriguez is markedly limited in his ability to understand and remember detailed instructions and his ability to carry out detailed instructions.  Thus, finding that Rodriguez could perform jobs categorized as requiring Level 2 or Level 3 reasoning directly conflicts with Dr. Stailey-Steiger's opinion, an opinion the ALJ said that he gave "substantial weight."  The ALJ does not explain this

22

contradiction.[4]

Again, the ALJ's failure to explain his reasoning fully leaves the court not knowing why the ALJ formed his hypothetical questions as he did.  Consequently, it cannot be said that the ALJ's decision based on the answers to those questions is supported by substantial evidence.  For this reason, the case must be remanded to the ALJ to examine Dr. Stailey-Steiger's opinion more carefully and better explain how he used that opinion in reaching his decision.

C.      *Whether substantial evidence supports the ALJ's evaluation of the opinions of the examining state agency psychologist*

Plaintiff's argument regarding the opinions of the examining state agency psychologist, Dr. Tanley, is not entirely clear.  The case must be remanded, however, for the reasons described above.  Consequently, the court need not examine Rodriguez's third argument.

VII.  Decision

Because the ALJ failed to explain why he failed to give Dr. Welch's opinion regarding Rodriguez's functional limitations controlling weight and failed adequately to explain how he used Dr. Dr. Stailey-Steiger's opinion in reaching his decision, the ALJ's decision is not supported by substantial evidence.  For these reasons, the court REVERSES the opinion of the Commissioner and REMANDS the case for further proceedings consistent with this opinion.

_____

[4]  It is unclear whether the problem lies in the way the ALJ phrased the hypothetical or in the VE's opinion regarding which jobs Rodriguez could perform.  The ALJ's hypothetical included a limitation to "simple, routine tasks involving no more than simple, short instructions and simple work-related decisions," tr. at 50, would seem to limit the hypothetical individual to tasks at 01 Reasoning Level Development.

23

**IT IS SO ORDERED.**


Date:  February 6, 2012                    s/ *Nancy A. Vecchiarelli*
                                           Nancy A. Vecchiarelli
                                           U.S. Magistrate Judge